UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARCH INSURANCE COMPANY,

       Plaintiff,

v.

COMMERCIAL STEEL TREATING
CORP., CURTIS METAL FINISHING CO.,
and DAVID L. SCOTT,

       Defendants.

_____/

Case No. 11-cv-15535
Paul D. Borman
United States District Judge

**OPINION AND ORDER**
**(1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 39),**
**and (2) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. No.**
**40)**

This is a declaratory judgment action regarding coverage under an insurance agreement.

Arch Insurance Company ("Plaintiff") filed the Complaint on December 19, 2011.  (Dkt. No. 1.)

Commercial Steel Treating Corporation ("Commercial Steel"), Curtis Metal Finishing Company

("Curtis"), and David L. Scott (collectively "Defendants"), filed a Counterclaim against Plaintiff on

January 25, 2012.  (Dkt. No. 7.)  Plaintiff filed an Amended Complaint on June 5, 2012.[1]  (Dkt. No.

28.)

On November 29, 2012, Plaintiff and Defendants filed cross motions for summary judgment.

_____

[1]Plaintiff filed a Motion for Leave to File Amended Complaint on March 26, 2012 (Dkt.
No. 15), which Defendants opposed (Dkt. No. 19).  United States Magistrate Judge R. Steven
Whalen granted Plaintiff's Motion for Leave to File Amended Complaint on June 4, 2012.  (Dkt.
No. 26.)

(Dkt. Nos. 39 and 40.)  Defendants filed their response on January 3, 2013 (Dkt. No. 44), and

Plaintiff filed its response on January 4, 2013 (Dkt. No. 45).  Plaintiff and Defendants filed replies

on February 1, 2013.  (Dkt. Nos. 49 and 50.)

For the reasons stated below, the Court will:

(1) GRANT Plaintiff's Motion for Summary Judgment; and

(2) DENY Defendants' Motion for Summary Judgment.

## I.  BACKGROUND

Defendant Curtis is a wholly owned subsidiary of Defendant Commercial Steel.  Defendant

Scott is the Vice President of Defendant Curtis.

Defendant Curtis is a steel treating company with a facility located in Sterling Heights,

Michigan.  One way in which steel is treated at the Sterling Heights facility involves zinc-phosphate

plating, which is done using zinc-phosphate plating lines.  The zinc-phosphate plating lines consist

of a series of tanks, filled with different chemical solutions, that are used, in part, to clean and rinse

the steel.  One of these tanks, called a "pickle tank," is filled with a sulfuric acid solution.

Defendants operate two zinc-phosphate plating lines at the Sterling Heights facility, which are

identified as Lines 11 and 14.

Defendants operated lines 11 and 14 pursuant to an Air Use Permit issued by the Michigan

Department of Environmental Quality ("MDEQ").  The Air Use Permit required, *inter alia*, that

Defendants operate Lines 11 and 14 with a "scrubber"[2] installed and operating, and that all exhaust

_____

[2]Scott M. Hoensheid, President of Defendants Curtis and Commercial Steel, defined a
"scrubber" during his deposition testimony as "a device where the pickle [tank] fumes are
brought into [it,] and through absorption[, a]ny contaminates that are in that pickle would be
removed prior to letting it out into the atmosphere."  (Pl.'s Mot. for Summ. J., Ex. 5, Hoensheid
Dep. at 27.)

gases from Lines 11 and 14 be discharged at least 35 feet above ground.

On January 18, 2010, the exhaust stack used by Lines 11 and 14 was partially toppled during a windstorm, which caused it to be less than 35 feet above ground. Despite this damage, Defendants continued to operate Lines 11 and 14, in violation of their Air Use Permit. Defendants repaired the damaged stack on March 23, 2010, but then discovered a cracked exhaust pipe on Lines 11 and 14. Defendants repaired the cracked pipe on March 30, 2010. However, due to the cracked pipe, Defendants operated Lines 11 and 14 with the scrubber offline from March 23, 2010, to March 30, 2010, in violation of their Air Use Permit.

**A.**

Defendants purchased a Private Company Management Liability and Crime Insurance policy (the "Policy") from Plaintiff, which had an operative period from October 1, 2009, to October 1, 2010. Coverage under the Policy included a Directors, Officers, and Organization Liability Coverage section, which provided coverage for defense costs associated with a "criminal proceeding commenced by the return of an indictment, information or similar pleading . . . ." (Pl.'s Mot. for Summ. J., Ex. 1, Insurance Policy, Pg ID 382.) The Policy excluded from coverage any loss:

> arising from, based upon, or attributable to any:
>
>     a.    discharge, dispersal, release, escape, seepage, migration or disposal of Pollutants, . . . or any threat of such discharge, dispersal, release, escape, seepage, migration or disposal; or
>
>     b.    direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants . . . .

(Insurance Policy, Pg ID 385.)

The Policy defined "Pollutants" as:

3

> any solid, liquid, gaseous, biological, radiological or thermal
> contaminant or irritant, including, without limitation, smoke, vapor,
> soot, fumes, acids, alkalis, chemicals, mold, fungi, odors, noise, lead,
> oil or oil products, radiation, asbestos or asbestos containing
> products, waste or any electric, magnetic, or electromagnetic field of
> any frequency. . . .

(Insurance Policy, Pg ID 372.)

**B.**

On March 25, 2010, the Michigan Department of Natural Resources and Environment ("MDNRE") conducted an inspection of Defendants' Sterling Heights facility and observed that Lines 11 and 14 had been operating without an exhaust stack at least 35 feet above ground from January 18, 2010, to March 23, 2010, and that the Lines were operating without a scrubber beginning on March 23, 2010.  In a follow-up inspection on April 1, 2010, MDNRE learned that Lines 11 and 14 had operated without the scrubber until March 30, 2010.  On April 5, 2010, MDNRE sent Defendants a Violation Notice based on Defendants' violations of their Air Use Permit.

Anticipating criminal proceedings, Defendants forwarded the MDNRE Violation Notice to Plaintiff on May 18, 2010, seeking coverage under the Policy.  Plaintiff denied coverage for the MDNRE Violation Notice in a letter dated June 25, 2010, stating "[t]o the extent that this Insuring Agreement is triggered by the Violation Notice, the Policy contains an exclusion that applies to a Claim involving Pollutants."  (Pl.'s Reply, Ex. 12, June 25, 2010 Letter.)  In addition, the June 25, 2010 Letter included a reservation of rights, stating:

> Arch expressly reserves all of its rights and defenses under the Policy
> and available at law with respect to this matter, including whether
> this matter constitutes a Claim as defined in the Policy and without
> limitation the right to assert any of the foregoing coverage defenses
> and to raise additional Policy terms, conditions, and defenses as

4

> additional facts come to Arch's attention.  Nothing herein shall be construed as a waiver of any rights or defenses that Arch now has or hereafter may have under the Policy or at law.

(*Id.*)

On December 4, 2010, the Macomb County Prosecutor initiated a criminal action against Defendants Scott and Curtis in state court based on the aforementioned permit violations.  On July 26, 2011, the Macomb County Prosecutor filed an Amended Misdemeanor Complaint against Defendants Scott and Curtis, which alleged three criminal violations of Michigan environmental laws.  Specifically, the Amended Misdemeanor Complaint alleged one count of failure to report an equipment malfunction to the MDNRE (Count I), and two counts of failure to comply with a permit issued under the Air Pollution Control Act (Counts II and III).

Because of Plaintiff's denial of coverage, Defendants hired their own defense counsel in the criminal case, choosing separate attorneys to represent Defendants Curtis and Scott.  Defendants sought a dismissal of Count I of the Amended Misdemeanor Complaint, which the state court granted.  The Prosecutor appealed this decision.  On October 12, 2012, Defendants and the Prosecutor entered into a plea agreement.  In exchange for the dismissal of all the criminal claims and the Prosecutor's appeal, both Defendants agreed to enter a plea of no contest to Counts II and III, which the state court would take under advisement for two years, and Defendant Curtis agreed to pay $90,000 to the Macomb County Environmental Problems: Lake/River Fund.

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when there are disputes over facts that might affect the

5

outcome of the suit." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotation marks omitted). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008). The Court does not weigh the evidence, but instead must "determine whether there is a genuine issue for trial." *Id.* (internal quotation marks omitted). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. ANALYSIS

Initially, Plaintiff argues that the facts alleged in the Amended Complaint should be deemed admitted because Defendants have failed to file an answer. Defendants assert that they did prepare a response to the Amended Complaint, but "it is not clear at this time why it was not accepted by the e-filing system." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 7, n. 2.) Defendants did file an Answer to the Amended Complaint on December 3, 2012. (Dkt. No. 41.)

Defendants' late-filed Answer does not appear to raise any new issues or defenses, or otherwise prejudice Plaintiff. Although the failure to timely file the Answer was due to error or inadvertence, there is no evidence of bad faith or improper purpose by Defendants. Further, Defendants remedied their error as soon as it was brought to their attention in Plaintiff's Motion for Summary Judgment. The United States Court of Appeals for the Sixth Circuit has found that, under similar circumstances, allowance of a late-filed answer was not an abuse of discretion. *Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 428-30 (6th Cir. 2006). The Court will, therefore, permit Defendants late-filed Answer, and the allegations in the Amended Complaint are not deemed

admitted.

**A.**

Plaintiff next argues that Defendants' insurance claim is barred under the Pollution Exclusion in the Policy. The Michigan Supreme Court has described the principles used when interpreting insurance contracts as follows:

> First, an insurance contract must be enforced in accordance with its terms. A court must not hold an insurance company liable for a risk that it did not assume. Second, a court should not create ambiguity in an insurance policy where the terms of the contract are clear and precise. Thus, the terms of a contract must be enforced as written when there is no ambiguity.
>
> While we construe the contract in favor of the insured if an ambiguity is found, this does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefitting an insured. The fact that a policy does not define a relevant term does not render the policy ambiguous. Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings. . . .

*Citizens Ins. Co. v. Pro-Seal Service Group, Inc.*, 477 Mich. 75, 82-83 (2007) (citation omitted).

Plaintiff contends that Defendants' claim is barred under both subparagraph a. and b. of the Pollution Exclusion. Plaintiff first argues that the Air Use Permit granted by the MDNRE to Defendants was a "direction, request or voluntary decision to . . . abate, . . . clean up, remove, contain, treat, detoxify or neutralize Pollutants." The criminal proceedings based on Defendants' violation of the Air Use Permit therefore arise from, or are attributable to, a direction, request, or voluntary decision to abate pollutants. Plaintiff next argues that Defendants' claim is also barred under subparagraph a. of the Pollution Exclusion, because operating Lines 11 and 14 without a functional scrubber caused pollutants to be "discharge[d], dispers[ed], [or] release[d]," or at least

7

threatened "such discharge, dispersal, [or] release" of pollutants.

Defendants argue that there is no allegation in the underlying criminal complaint that any pollutants were discharged or released. Defendants point out that the Sterling Heights facility is kept at negative pressure, meaning any fumes that might have escaped from Lines 11 and 14 would remain inside the building. However, the Policy does not require the release of pollutants into an outdoor environment. The Policy excludes from coverage *any* actual or threatened "discharge, dispersal, release, escape, seepage, migration or disposal of Pollutants . . . ."

Defendants also note that the criminal charges at issue arise under Mich. Comp. Laws §§ 324.5531(1) and (2). These sections provide a misdemeanor charge and fine for "fail[ing] to obtain or comply with a permit[,]" or "fail[ing] to notify or report information required to be submitted under this part or a rule promulgated under this part . . . ." Criminal penalties for release of hazardous air pollutants are provided in §§ 324.5531(4)-(6). Defendants therefore contend that the criminal charges against them are limited to the permit violations and failure to disclose, and do not relate to any discharge or release of air pollutants.

The purpose of the Air Use Permit was to prevent the release of potentially hazardous fumes from Lines 11 and 14. A direct result of Defendants' operation of Lines 11 and 14 without a functioning scrubber, in violation of the Air Use Permit, is the release of fumes from Lines 11 and 14 into the Sterling Heights facility. There is thus "significantly more than a remote connection" between Defendants' permit violations and the actual or threatened release of pollutants from Lines 11 and 14. *McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 341 (2001). Furthermore, even if there was no threatened or actual release of pollutants from Lines 11 and 14, the criminal charges arise out of a direction or request from MDNRE, via the Air Use Permit, to abate potentially

8

hazardous pollutants.  Accordingly, both subparagraphs a. and b. of the Pollution Exclusion apply to bar the criminal charges against Defendants.

Defendants contend that the sulfuric acid fumes released by Lines 11 and 14 should not be considered a "pollutant" under the Policy.  Defendants rely on the Affidavit of David M. Yanochko, an environmental engineer.  (Defs.' Mot. for Summ. J., Ex. 3, Yanochko Aff.)  Mr. Yanochko states in his affidavit that, based on the MDEQ Air Quality Division's ("AQD") recommended emissions calculations, "the maximum potential concentration of [sulfuric acid] in the air exhausted from [Lines 11 and 14] without the use of a scrubber would be 0.0000000002 ug/m."  (Yanochko Aff. ¶ 8.)  This is "five BILLION times less than the MDEQ-AQD annual [initial threshold screening levels] at the exhaust stack."  (Yanochko Aff. ¶ 9.)  Mr. Yanochko included with his affidavit a list "of a number of products . . . [that] have the potential for greater human exposure to [sulfuric acid] then created by the operation of Curtis Metal Finishing [Lines 11 and 14]."  (Yanochko Aff. ¶ 17.) The products on Mr. Yanochko's list include various dishwashing and laundry detergents and hand soap.  (Yanochko Aff., Pg ID 619.)  Defendants thus admit that there were sulfuric acid emissions from Lines 11 and 14 while the scrubber for those lines was not operating, but claim that these emissions were not "Pollutants" because they were not in any way harmful to human health.

Plaintiff asserts that any amount of sulfuric acid emissions from Lines 11 and 14 meets the definition of "Pollutant" under the policy.  Plaintiff notes that the word "acid" is specifically included "without limitation" in the Policy's definition of "Pollutants."  Plaintiff's Assistant Vice President for Executive Assurance Claims, Jeremy Moen, testified that the Pollution Exclusion is triggered if even "[a] molecule" of "Pollutant" material is released.  (Defs.' Mot. for Summ. J., Ex. 4, Moen Dep. 105.)

9

There is no dispute that the original purpose of the permit at issue was to abate the release of pollutants from the Sterling Heights facility.  As noted in Defendants' January 25, 2012 request to modify their Air Use Permit, the Air Use Permit was originally required because Defendants used an acid with higher emissions.  The fact that Defendants later switched to a lower-emitting acid, which allegedly abrogated the need for a scrubber, does not invalidate the Air Use Permit or the potential liabilities that arise from its violations.  The criminal charges arising from Defendants' violations of that permit thus arise from a "direction, request or voluntary decision to . . . abate . . . pollutants . . . ."

Plaintiff argues that the minimal amount of fumes released from Lines 11 and 14 cannot qualify as "pollutants" based on the reasoning in *Hastings Mutual Insurance Company v. Safety King, Inc.*, 286 Mich. App. 287 (2009).  The court in that case reasoned that the terms "irritant" and "contaminant" must be read and interpreted in conjunction with the term "pollution" in determining their meaning under the insurance contract.  *Id*. at 294.  The court first determined the plain and ordinary meaning of the terms "irritant" and "contaminant" by quoting their dictionary definitions, and then applied those definitions in the context of the pollution exclusion clause at issue:

> Here, the terms "irritant" and "contaminant" are used to define "pollution" in a pollution exclusion clause, a provision in an insurance policy that limits the scope of liability coverage for damage claims.  Considered in this context, an "irritant" is a substance that, because of its nature and under the particular circumstances, is generally expected to cause injurious or harmful effects to people, property, or the environment.  And, considered in context, a "contaminant" is a substance that, because of its nature and under the particular circumstances, is not generally supposed to be where it is located and causes injurious or harmful effects to people, property, or the environment.

*Id*. at 294-95.

Defendants' argument would be effective if the criminal charges related only to the release of pollutants. However, the criminal charges include violations of Defendants' Air Use Permit. Whether any pollutants actually leaked is immaterial where Defendants have clearly violated their Air Use Permit, which directed Defendants to abate pollutants. The Pollution Exclusion expressly applies to such criminal charges. Plaintiff thus properly denied coverage for Defendants' claims under the Policy, and Plaintiff is entitled to summary declaratory judgment that the Policy does not apply to the underlying criminal matters.

**B.**

Plaintiff argues that, even if Defendants' claim is not barred by the Pollution Exclusion, Plaintiff is not obligated to pay the claim because none of Defendants' claimed damages fall within the definition of "Loss" under the Policy.

The Policy defines "Loss," for purposes of the Directors, Officers, & Organization Liability Coverage portion, as "the amount that the Insureds are legally obligated to pay resulting from a Claim, including, without limitation, damages, settlements, judgments, pre- and post-judgment interest, Defense Costs, and Investigative Costs." (Insurance Policy, Pg ID 384.) This definition excludes, however, "taxes, fines or penalties imposed by law[.]" (*Id.*)

The Plea Agreement entered into between Defendants and the Macomb County Prosecutor provides that "[Curtis] shall pay $90,000, payable by check to 'Macomb County Environmental Problems: Lake/River Fund' on the date the plea is taken under advisement. No other fines, costs, restitution, penalties, or assessments shall be imposed." Plaintiff asserts that the $90,000 payment is a fine or penalty excluded from the definition of "Loss" under the Policy.

Defendants argue that, because the Plea Agreement is not an adjudication of any wrongful

11

act, and Macomb County is dismissing the criminal charges, the $90,000 payment should not be considered a fine or penalty. Defendants argue that, instead, the $90,000 payment should be considered a "charitable donation." This dog doesn't hunt!

Defendants' argument is undercut by the crossing out of "In lieu of a fine," before the language in paragraph 3 of the Plea Agreement. Without this modification to paragraph 3, it would be clear that the parties intended the $90,000 payment to be considered something other than a fine. With the modification, the language suggests the opposite – that the $90,000 payment should be considered a fine.

Furthermore, even if the $90,000 payment is considered a charitable donation, as suggested by Defendants, the payment is still excluded from the definition of "Loss" because it is an "amount for which the Insureds are not financially liable or for which the claimants are without legal recourse to the Insureds[.]" (Insurance Policy, Pg ID 384.) There is no legal requirement compelling Defendants to make a charitable donation, and there is no legal recourse available to Macomb County to pursue charitable donations. Accordingly, Plaintiff is not required to provide coverage for the $90,000 payment under the Plea Agreement.

Defendants also seek coverage for their defense costs in the criminal matter. Because Plaintiff properly denied coverage pursuant to the Pollution Exclusion, as explained *supra*, Defendants are not entitled to reimbursement for any defense costs under the Policy.

## C.

Count II of the Amended Complaint alleges that Plaintiff is not liable for Defendants' claim based on the "Willful Acts Exclusion" in the Policy. Because the Pollution Exclusion applies for

reasons stated *supra*, the Court declines to address Plaintiff's arguments under the "Willful Acts Exclusion."

**D.**

Defendants argue that the Policy is ambiguous or was misrepresented to them by Plaintiff. Defendants claim that, because of this ambiguity, the Policy should be construed against Plaintiff and interpreted to provide coverage for the costs related to both the defense and obligations of a criminal complaint. Defendants have not, however, pointed to any words in the Policy that are capable of conflicting interpretations. *See Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel*, 460 Mich. 558, 566 (1999) (holding that "[a]n insurance contract is ambiguous when its provisions are capable of conflicting interpretations.").

The Policy clearly labels both the Pollution Exclusion and Willful Acts Exclusion in numbered paragraphs under the heading "EXCLUSIONS." (Insurance Policy, Pg ID 385-87.) The Court finds no ambiguity in these exclusions or in the Policy's definition of "Pollutants." *See Hastings Mutual*, 286 Mich. App. 297 (interpreting similar terms and concluding "that the contract terms at issue here are not ambiguous. There is only one reasonable interpretation of each term when they are considered in accordance with their commonly used meanings and in the particular context of being in a pollution exclusion clause in an insurance policy.").

## IV. CONCLUSION

For the reasons stated above, the Court will:

(1) GRANT Plaintiff's Motion for Summary Judgment; and

13

(2) DENY Defendants' Motion for Summary Judgment.


**SO ORDERED.**

s/Paul D. Borman                                    
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 27, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 27, 2013.

s/Deborah Tofil                                    
Case Manager

14